**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

COVOL FUELS NO. 4, LLC,

        Plaintiff,

v.                             CIVIL ACTION NO.   5:12-cv-04138

PINNACLE MINING COMPANY, LLC,

        Defendant.

**MEMORANDUM OPINION & ORDER**

The Court has reviewed the *Defendant Pinnacle Mining Company, LLC's Motion for Summary Judgment* (Document 104), filed on October 21, 2013.   After careful consideration of the motion, the parties' memoranda, attached exhibits, and the entirety of the record, the Court, for the reasons stated herein, finds that the *Defendant Pinnacle Mining Company, LLC's Motion for Summary Judgment* should be granted.

**I.   FACTUAL & PROCEDURAL HISTORY**

The dispute herein arises from a strategic business alliance between two coal mining companies, Pinnacle Mining Company, LLC (Pinnacle), and Covol Fuels No. 4, LLC (Covol). Plaintiff Covol is incorporated in Utah with its principal place of business in Utah, and Defendant Pinnacle is incorporated in Delaware with its principal place of business in Ohio. (Compl. ¶¶ 9-10.)   From 2008 until 2012, the parties operated under a contract providing for Covol to process the coal waste material from Pinnacle's mining operation in Wyoming County,

West Virginia, into saleable coal.   (Compl. ¶ 13.)   Covol alleges that certain actions and omissions by Pinnacle breached the parties' contract, fraudulently and/or negligently misled Covol, and unjustly enriched Pinnacle.   (*See* Compl.)

Pinnacle owns and operates an underground coal mine in Wyoming County, West Virginia.   (Compl. ¶ 10.)   Near the end of its mining process, Pinnacle utilizes a wash plant to strip and clean the mined coal of unwanted particulates, and then deposits the resulting waste (refuse material) into an adjacent impoundment pond.   (Compl. ¶ 15.)   Prior to the parties' written agreement, an affiliate company of Pinnacle, Beard-Pinnacle, LLC, operated a coal waste processing facility near the impoundment to clean and process the refuse material into saleable coal.   (Compl. ¶ 16.)

In 2008, Covol purchased Beard-Pinnacle's assets at the Pinnacle mine, including the coal waste processing facility, for $14 million.[1]   (Compl. ¶ 18.)   In addition, Covol assumed a lease from Beard Technologies, Inc., that allowed it to operate the coal waste processing facility. (Compl. ¶ 19.)   The main business plan between Covol and Pinnacle was memorialized in a Coal Purchase and Refuse Recovery Agreement (CPRRA) dated February 15, 2008.   (*See* Document 21-2.)   The terms of the CPRRA relevant to this dispute are summarized as follows:

| | |
|---|---|
| Section 1. | Covol states its primary intention is to purchase, remove, transport, clean, and process the refuse material from Pinnacle's mine into saleable coal. |
| Section 4. | Covol agrees to purchase and process "all or part of the Refuse Material produced, previously, currently and any in the future" from Pinnacle's mine.   Covol will be responsible for transporting, storing, handling, and processing the refuse material and will do so "in such a way which does not interfere with Pinnacle's Mining Operations." |
| Section 5. | Covol will pay Pinnacle $1.00 per ton of saleable coal produced from |

---

[1]     This was accomplished through an Asset Purchase Agreement dated February 2008 between Covol and Beard-Pinnacle, LLC.

Covol's refuse material processing operation.

Section 7.     Both parties agree to comply in all respects with any and all laws, orders, mandates, and other governmental requirements.   The parties take sole responsibility for their own compliance with all governmental requirements and any penalties for failing to do so.

Section 8.     Covol must maintain and comply with the permits and licenses necessary for the operation of its coal waste processing plant.   Pinnacle must "maintain its existing permits that are required for its performance under this Agreement."

Section 10.    Covol maintains complete control over its operations but must conduct all activities in a manner that reasonably does the least possible damage to Pinnacle's premises.

Section 12.    The term of the contract is five years with a reoccurring option to renew for one year if the parties agree.   Covol can unilaterally terminate the contract at any time if Covol decides the waste processing operation is no longer economically feasible.

Section 16.    Either party can terminate the contract on the basis of material breach (after giving the breaching party an opportunity to cure), bankruptcy, or ceasing operations.

Section 18.    Pinnacle agrees to: (1) "permit Covol to operate the Processing Facility for recovery of the Refuse Material"; (2) provide Covol with an area near the impoundment to operate its processing facility; (3) grant Covol "any right-of-way reasonably needed by Covol to transport the Refuse Material from the ponds to the processing plant"; and (4) allow Covol ingress and egress over Pinnacle's property.

Section 20.    Pinnacle disclaims any express or implied warranties and representations regarding the refuse material or the suitability of Pinnacle's property for processing the refuse material.

Section 28.    The CPRRA "embodies the entire understanding between the Parties with respect to the subject matter hereof" and supersedes any prior understand or other writings.

(*See* Document 21-2.)   The CPRRA also mandates that Covol is responsible for the waste from

its processing facility, identifies West Virginia as the choice of law jurisdiction, and includes

3

terms regarding assignment, written notice, paying taxes, record-keeping, indemnification, insurance, and legal ownership and liability for the land and the refuse material.   (*Id.*)   The CPRRA also references a Coal Sales Agreement between Covol and Pinnacle Coal Sales, LLC. (Compl. ¶ 23.)

Covol renovated the coal waste processing facility and, in the summer of 2008, began removing and processing refuse material from the impoundment.[2]   (Compl. ¶ 24.)   To facilitate Covol's operations, "both Covol and Pinnacle regularly adjusted the water level in the impoundment by pumping water out" of it so that Covol could continue to access the refuse material.[3]   (Compl. ¶ 24.)   Initially, performance under the CPRRA proceeded smoothly and the agreement proved profitable for both Covol and Pinnacle Coal Sales.   (Compl. ¶ 24.)

By 2010, however, the slopes of the impoundment had become too steep for Covol to continue removing the available refuse material, so the company began an excavation project to remedy the problem.   (Compl. ¶ 25.)   The parties dispute whether Pinnacle encouraged Covol to excavate the impoundment, and whether Pinnacle agreed to pay for some of the expenses. (Compl. ¶ 25; Document 30 at 5.)   According to Covol, Pinnacle agreed that the project was necessary, "encouraged Covol to perform the excavation work," and "gave Covol its assurance that it would share the cost of the work evenly."   (Compl. ¶ 25.)   Pinnacle disagrees, arguing that it did not request that Covol complete the excavation project, nor did it agree to pay any of the expenses.   (Document 105 at 10.)   Pinnacle contends that it clearly rejected Covol's proposal to amend the CPRRA to provide that Pinnacle would share the cost of the excavation project.   (*Id.*)   The parties also dispute whether Pinnacle received any benefit from the

---

[2]       Covol spent $4 million to renovate the coal waste processing facility.   (Document 109 at 3.)
[3]       Pinnacle does not dispute that "during certain periods of time the water level in the impoundment was periodically adjusted by pumping water out of the impoundment."   (Document 30 at 4.)

excavation project.[4]  (Document 105 at 10; Document 109 at 14.)

Before beginning the excavation, Covol had to obtain approval from the Mine Safety and Health Administration (MSHA) on Pinnacle's existing MSHA plan.   (Document 105 at 5.) Per the revised MSHA plan, Covol intended to dredge the impoundment in six twenty-five (25) foot lifts, and anticipated that the water level in the impoundment would be lowered accordingly after each lift.[5]   (*Id.* at 6.)   MSHA approved the revised plan, and Covol proceeded with the excavation project at the expense of approximately $3.5 million.[6]   (Compl. ¶ 26.)

Around the same time period that Covol completed the excavation project, Pinnacle made two significant changes to its mining operations.   Pinnacle (1) upgraded its own wash plant, and (2) changed its water management system, defeating both companies' ability to lower or control the water level in the impoundment.   (Compl. ¶¶ 27, 30.)   Covol claims that the latter change made it "impossible for Covol to obtain access to the layers of coal waste that it can economically recover and process."   (Compl. ¶ 32.)   These two changes, discussed in more detail below, form the basis of Covol's claims against Pinnacle.

In late 2010, Pinnacle upgraded its wash plant.   (Document 105 at 8.)   Pinnacle does not dispute that improving its wash plant's efficiency resulted in less coal content being deposited in the impoundment.   (*Id.*)   Pinnacle claims that the wash plant was outdated and inefficient.   (*Id.*)   Pinnacle further argues that the CPRRA did not prohibit Pinnacle from upgrading the wash plant, nor did it require Pinnacle to inform Covol that it intended to do so.

---

[4]     Covol argues that it "bestowed a significant monetary benefit on Pinnacle by redesigning and recontouring the banks of the impoundment, including the removal of approximately one million cubic yards of unstable material from the banks of the impoundment."   (Compl. ¶ 55.)   Pinnacle denies these allegations.   (*See* Document 30 at 5.)

[5]     Covol asserts that Pinnacle submitted the water lowering plan to MSHA (Document 109 at 6-8), while Pinnacle argues that Covol submitted it.   (Document 105 at 6.)

[6]     The excavation project began in 2010 and was completed in 2011.   (Compl. ¶¶ 25-26.)

(*Id.*)   Regardless, Pinnacle claims that it told Covol of the planned upgrade in June 2010, and that Covol was aware that the upgrade would result in lower quality refuse material filling the impoundment.   (Document 105 at 9.)   Covol argues, however, that Pinnacle began planning to upgrade its wash plant in 1997, and failed to inform Covol of the same before the parties entered into the CPRRA.   (Document 109 at 13.)   According to Covol, this upgrade significantly decreased Covol's ability to efficiently process the refuse material into saleable coal.   (Compl. ¶¶ 28-29.)

The second change Pinnacle made—implementing the new water management system—was in response to a West Virginia Department of Environmental Protection (WVDEP) enforcement action against the company regarding selenium pollution.[7]   (Document 105 at 7.) According to Pinnacle, the company "sought guidance from experts [Barr Engineering (Barr)] on the selenium problem and engaged Covol in those discussions."   (Document 105 at 7.) Pinnacle claims that it chose the "best option for Pinnacle in managing the selenium": a "water recycling program . . . that processed the selenium-contaminated water through the Impoundment and an underground reservoir."   (*Id.*)   This program reduced the selenium concentration at Pinnacle's mine to a level in compliance with WVDEP standards.   (Document 105 at 8.)   It also increased the water in the impoundment, and eliminated both companies' ability to lower and control the water level.[8]   (Document 109 at 8, 10-11.)

Covol stresses that Pinnacle had an additional viable option for managing the selenium pollution issue—a water treatment program.   This method for managing selenium is allegedly

---

[7]      The Court notes that there are multiple disputes between the parties over Pinnacle's management of the selenium pollution issue.   Selenium is a contaminant found in coal seams and a problem for coal companies in this region.   (Document 105 at 14.)

[8]      Pinnacle does not dispute these facts.

used by Pinnacle's parent company at other mines, and was initially, albeit temporarily, submitted to the WVDEP as the company's plan for selenium management at the Wyoming County, West Virginia, mine.[9]   (Document 109 at 10.)   Covol contends that Pinnacle could have, and should have, chemically or biologically treated the water, which would not have negatively impacted Covol's operations.   (Document 109 at 11.)   Covol stresses that a water treatment program was the initial solution proposed by Barr in its draft report.[10]   (Document 109 at 11.)   Covol claims that Pinnacle persuaded Barr to change its draft report to eliminate the microbial option and instead recommend the water management system, as proposed in Barr's final report.   (Document 109 at 11-12.)

---

[9]      Covol asserts that "[i]n April 2008, Pinnacle submitted a permit modification application to WVDEP to reduce selenium discharge through bioremediation treatment of the water."   In October 2008, Pinnacle changed the treatment plan in its permit modification to the water management system, which Pinnacle implemented after the WVDEP approved it in February 2009.   (Document 109 at 10-11.)   Pinnacle does not dispute these facts.

[10]      Pinnacle does not dispute this fact.   However, Pinnacle argues that "neither of those reports 'rejected' water management techniques as a solution or concluded that treatment alone was a viable option; instead, both reports concluded that water management was necessary."   (Document 113 at 16.)   The Court reads otherwise. A side-by-side comparison of the draft report to the final report reveals multiple material changes.   For example, in the draft report, Barr states:

> Overall, of the nine treatment technologies reviewed, the passive microbial reactor appears to be the best suited for application at the site. It has been proven to be able to reduce selenium concentrations to meet regulatory requirements and the design is easily adaptable to the site.   The low capital and operational costs and minimal supervision make this option an attractive solution.

(Document 109-1 at 292.)   In Barr's final report, however, this language was changed to:

> None of the nine treatment technologies reviewed has proven to be a technically or practically feasible means of complying with low level selenium discharge limits on a mining scale. Any treatment alternative will require additional testing and evaluation.

(Document 104-22 at 63.)   Further, the Court found the following language in the draft report, but not the final:

> Finally, pump flow from the impoundment is a significant contributor to the water system discharge and should be minimized when possible.   The fines recovery process [processing of refuse material] and required impoundment water elevation changes further exacerbate the selenium contribution.

(Document 109-1 at 288.)

In essence, Covol argues that by choosing water management instead of water treatment, Pinnacle chose to eliminate both companies' ability to lower the water level in the impoundment and "mak[e] it impossible for Covol to conduct operations."   (Compl. ¶ 4; Document 109 at 19.)   Covol argues this decision effectively killed its waste processing operation. Because the water level in the impoundment could no longer be lowered, Covol could no longer economically access the refuse material.   (Compl. ¶ 34.)   Covol contends that Pinnacle should have instead chosen the water treatment option.   For support, Covol notes that the water treatment method was initially presented to the WVDEP, was initially proposed by Barr in its draft report, was used by Pinnacle's parent company at other mines, and would not have interfered with Covol's operations.   (Compl. ¶ 5; Document 109 at 19.)

In addition, Covol argues that Pinnacle did not keep Covol reasonably informed, respect Covol's contractual or common law rights, or consider Covol's recommendations regarding the selenium management issue.   (Document 109 at 12.)   Covol argues that Pinnacle only provided Covol with Barr's draft report instead of its final report, and that Covol relied on the representations in the draft report to proceed with the excavation project.   (*Id.* at 27.)   Covol also claims that Pinnacle ignored Covol's concerns and complaints about losing the ability to lower the water level, and that Pinnacle understood that lowering the water level was necessary for Covol to continue operations.   (Compl. ¶¶ 6, 30, 33; Document 109 at 20.)

The parties vigorously dispute whether Pinnacle expressly or impliedly agreed to continue lowering the water level in the impoundment.   Covol asserts that Pinnacle "repeatedly represented it *could* and *would* lower the water."   (Document 109 at 6.)   In addition, Covol argues that the CPRRA requires Pinnacle to lower the water level because (1) Pinnacle expressly

8

granted Covol "any right-of-way reasonably needed by Covol to transport the Refuse Material" from the impoundment pond to its processing plant; (2) Pinnacle "approved and submitted plans to governmental agencies that expressly provided" for lowering the water level; and (3) Covol's right to access the refuse material was a predicate act and necessary to achieve the general purpose of the agreement—to recover refuse material to process into saleable coal.[11] (Document 21-2 at 10; Document 109 at 15-18.)   Pinnacle, on the other hand, contends that the "ability to pump water out of the Impoundment was always limited, both before and after Covol started operating," and that Covol's plant manager was aware of this limitation.   (Document 105 at 6.)   Pinnacle believes that no term of the CPRAA, express or implied, requires it to lower the water level of the impoundment.   (Document 105 at 14.)

As a result of Pinnacle's actions (upgrading the wash plant and implementing the water management system) and alleged omissions (failing to inform Covol of the same), Covol argues that it was forced to shut down its operations.   (Compl. ¶ 34.)   Covol subsequently filed a *Complaint* (Document 1) against Pinnacle on August 7, 2012 asserting four claims: (I) breach of contract; (II) fraudulent concealment; (III) negligent misrepresentation; and (IV) unjust enrichment.   (Compl. ¶¶ 38, 42, 49, and 57.)   Covol demands a jury trial and seeks judgment in its favor, compensatory and consequential damages, interest on any judgment, costs and attorneys' fees, and all other just and proper relief.   (Compl. at 12.)   In its *Answer* (Document 21) and *Amended Answer* (Document 30), Pinnacle denies any wrongdoing and asserts multiple

---

[11]     Covol claims that when it purchased the waste processing facility in 2008, Pinnacle was operating under an "MSHA-approved mining plan that required the lowering of the water level in the impoundment."   Additionally, "Covol reviewed the [plan] and discussed it with Pinnacle prior to the execution of the CPRRA; both parties understood the importance of lowering the water level in the impoundment so that Covol would have access to the coal fines."   (Document 109 at 7.)

defenses.[12]

After extensive discovery by both parties,[13] Pinnacle filed *Defendant Pinnacle Mining Company, LLC's Motion for Summary Judgment* (Document 104) and accompanying *Memorandum in Support* (Document 105) on October 21, 2013.[14]   Covol filed its *Opposition to Defendant Pinnacle Mining Company LLC's Motion for Summary Judgment* (Document 109) on November 5, 2013.[15]   Pinnacle then filed *Defendant Pinnacle Mining Company, LLC's Reply in*

---

[12]        Pinnacle attached the following as exhibits to its Answer: (A) a thirty-one page "Asset Purchase Agreement" dated February, 2008, and signed on separate pages by Covol Fuels No. 4, LLC, and Beard-Pinnacle, LLC; (B) an eighteen page "Coal Purchase and Refuse Recovery Agreement" dated February 15, 2008, and signed by Covol Fuels No. 4, LLC, and Pinnacle Mining Company, LLC; and (C) a fourteen page "Coal Sales Agreement" dated February, 2008, and signed on separate pages by Covol Fuels No. 4, LLC, and Pinnacle Coal Sales, LLC. The same three exhibits that were attached to Pinnacle's original Answer were attached to its Amended Answer.

[13]        The Court notes that discovery was ongoing as of November 5, 2013, evidenced by footnote 26 of Covol's response in opposition, which states, in relevant part, that "the parties are in the process of arranging a deposition." (Document 105 at 10, n. 26.)

[14]        Pinnacle attached the following as exhibits to its Memorandum in Support of Its Motion for Summary Judgment: (A) portions of the transcript of the deposition of J. Scott Ballard on September 11, 2013, and several of the exhibits; (B) portions of the transcript of the deposition of Kirk A. Benson on September 30, 2013, and several of the exhibits; (C) additional portions of the transcript of the deposition of Kirk A. Benson on September 30, 2013; (D) portions of the transcript of the deposition of William C. Boor on September 27, 2013, and a copy of the Coal Sales Agreement between Covol Fuels No. 4, LLC, and Pinnacle Coal Sales, LLC; (E) portions of the transcript of the deposition of Matthew R. Cartier on July 23, 2013, and several of the exhibits; (F) portions of the deposition of Russell E. Combs on September 5, 2013; (G) portions of the deposition of John W. Flegel on September 4, 2013, and one of the exhibits; (H) portions of the deposition of William H. Gehrmann, III on October 1, 2013, and several of the exhibits; (I) portions of the deposition of Edward H. Greenwald, Jr. on July 24, 2013, and several of the exhibits; (J) portions of the deposition of Barry O'Bryan on August 7, 2013; (K) portions of the deposition of Roy Palmer on August 8, 2013, and several of the exhibits; (L) portions of the Rule 30(b)(6) deposition of Covol Fuels No. 4, LLC and Gina Rau on October 1, 2013, and several of the exhibits; (M) portions of the deposition of Michael Stevens Rich on October 2, 2013, and one of the exhibits; (N) portions of the deposition of Donald S. Risher on September 12, 2013, and one of the exhibits; (O) portions of the deposition of John R. Shaal on July 11, 2013, and one of the exhibits; (P) portions of the deposition of Donald Douglas Townsend on September 27, 2013, and one of the exhibits; (Q) portions of the deposition of D. Douglas Townsend on July 12, 2013, and several of the exhibits; (R) portions of the deposition of Darrell J. Turner on September 25, 2013, and several of the exhibits; (S) one portion of the deposition of Duke D. Vetor on September 24, 2013; and (T) Declaration of D. Douglas Townsend dated October 16, 2013, and the exhibits.

[15]        Covol attached the following as exhibits to its Opposition to Defendant Pinnacle Mining Company, LLC's Motion for Summary Judgment: (A) portions of the deposition of William C. Boor on September 27, 2013; (B) portions of the deposition of Matthew R. Cartier on July 23, 2013; (C) portions of the deposition of Russell E. Combs on September 5, 2013; (D) portions of the deposition of Barry Douglas Dangerfield on September 17, 2013; (E) portions of the deposition of John W. Flegel on September 4, 2013; (F) portions of the deposition of Barry O'Bryan on August 7, 2013; (G) portions of the deposition of Roy Palmer on August 8, 2013; (H) portions of the Rule 30(b)(6) deposition of Covol Fuels No. 4, LLC and Gina Rau on October 1, 2013; (I) one portion of the deposition of Donald S. Risher on September 12, 2013; (J) portions of the deposition of John R. Shall on July 11, 2013; (K) portions of the deposition of D. Douglas Townsend on July 12, 2013; (L) portions of the Rule 30(b)(6)

*Support of Its Motion for Summary Judgment* (Document 113) on November 15, 2013.[16]   The

deposition of Donald Douglas Townsend on September 27, 2013; (M) portions of the deposition of Darrell J. Turner on September 25, 2013; (N) an eighteen page "Coal Purchase and Refuse Recovery Agreement" dated February 15, 2008, and signed by Covol Fuels No. 4, LLC, and Pinnacle Mining Company, LLC; (O) a five page copy of a Microsoft Excel document entitled "FY2011 Budget"; (P) a copy of two emails addressed to Barry Dangerfield and dated April 26, 2012; (Q) a copy of a chain of emails between Darrell Turner, Barry Dangerfield, Barry O'Bryan, Roy Palmer, and others dated April 26, 2013; (R) a draft of a report entitled "Preliminary Selenium Management Plan" prepared by Pinnacle Mining Company, LLC, for Cliffs Natural Resources, and dated June 2010; (S) a copy of a chain of six emails between Barry O'Bryan, Russell Combs, John Shaal, and Roy Palmer dated March 23 to March 31, 2011; (T) a report entitled "Preliminary Selenium Management Plan" prepared by Pinnacle Mining Company, LLC, for Cliffs Natural Resources, and dated August 2010; (U) a copy of a letter addressed to Douglas Townsend from Robert Hardman dated August 27, 2010, and an enclosure entitled "Memorandum for Robert Hardman" and dated July 13, 2010; (V) a copy of a presentation entitled "Pinnacle Preparation Plant Upgrade" for the Board of Directors meeting on November 11, 2009; (W) a copy of an MR-5 Application for WV/NPDES Permit Modification by Pinnacle Mining Company, LLC, entitled "Article 11 WV/NPDES Permit WV0090000 WV/NPDES Permit Modification No. 52" dated April 2008 and including attachments; (X) a copy of a letter addressed to Joseph Ross from Jeffery Music dated October 6, 2008; (Y) a copy of a letter addressed to Joseph Ross from D. Douglas Townsend dated December 8, 2008, and an enclosure entitled "Treatment Plan for Achieving Compliance with Selenium Discharge Limit"; (Z) a three page copy of a document entitled "Pinnacle Hydologic Issues Call" and dated February 5, 2009; (AA) a copy of a presentation entitled "Selenium Water Management" by Doug Townsend dated May 2010; (BB) a copy of a chain of three emails between John Flegel and others dated June 2 to June 8, 2010; (CC) a copy of an email from Jeffery McCulloch to Douglas Poush and others dated August 17, 2010; (DD) a copy of a chain of seven emails between Barry O'Bryan, John Shaal, Roy Palmer, Russell Combs, and others dated March 23 to March 31, 2011; (EE) a copy of a chain of seven emails between Barry Dangerfield, Mark Nelson, Barry O'Bryan, and others dated April 26 to May 2, 2012; (FF) a copy of a draft of a letter addressed to John Flegel from Paul Swenson and Doug Poush dated April 8, 2010; (GG) a three page copy of a document entitled "Summary of Meeting with Mine Safety and Health Administration (District 4) Regarding Smith Branch Slurry Impoundment – Fine Coal Recovery Plan Pinnacle Fine Coal Cleaning Facility" prepared by Roger Cecil and dated December 5, 2008; (HH) a copy of a chain of seven emails between Barry Dangerfield, Douglas Townsend, Gina Rau, and others dated June 2 to August 24, 2010; (II) a copy of a chain of four emails between Doug Williams, Jeff Music, and others dated March 27 to April 5, 2009; (JJ) a copy of a document entitled "Mine Permit No. O402292" and several attachments; (KK) a copy of a letter addressed to Jeff Music from Robert Hardman dated December 3, 2008; (LL) a copy of a document entitled "Responses to MSHA Comments Email Dated April 13, 2009 Proposed Modifications to Existing Fine Coal Recovery Plan Smith Branch Slurry Impoundment . . ." prepared by Geo/Environmental Associates, Inc. for Headwaters Energy Services and dated July 24, 2009, and several attachments; (MM) a copy of an undated letter addressed to Ronald Miller from Robert Hardman, and several enclosures; (NN) a copy of a chain of three emails between John Shaal, Matthew Cartier, and others dated October 14 to October 17, 2008; (OO) a copy of an email from Matthew Cartier to John Shaal and others dated December 31, 2008; (PP) a copy of a chain of two emails between John Shaal, Darrell Turner, and others dated July 22, 2010; (QQ) a copy of a two page document entitled "Pinnacle Plant Summary" dated March 19, 2012; (RR) a copy of a two page document containing graphic representations; and (SS) a copy of a six page document containing graphic representations.

[16]      Pinnacle attached the following exhibits to its Reply in Support of Its Motion for Summary Judgment: (A) one portion of the deposition of J. Scott Ballard on September 11, 2013, and one of the exhibits; (B) one portion of the Rule 30(b)(6) deposition of Kirk A. Benson on September 30, 2013; (C) one portion of the deposition of Kirk A. Benson on September 30, 2013; (D) several portions of the deposition of William C. Boor on September 27, 2013; (E) one portion of the deposition of Matthew R. Cartier on July 23, 2013, and one of the exhibits; (F) portions of the deposition of Russell E. Combs on September 5, 2013, and one of the exhibits; (G) portions of the deposition of Barry Douglas Dangerfield on September 17, 2013; (H) portions of the deposition of John W. Flegel on September 4, 2013; (I) portions of the deposition of William H. Gehrmann, III on October 1, 2013, and two of the exhibits; (J) portions of the deposition of Edward H. Greenwald, Jr. on July 24, 2013, and one of the exhibits; (K) portions of the

Court has examined the entirety of the record and now considers summary judgment on each of

Covol's four claims.

## II. STANDARD OF REVIEW

The well-established standard for consideration of a motion for summary judgment is that

summary judgment should be granted if the record, including the pleadings and other filings,

discovery material, depositions, and affidavits, "shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–

(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v.*

*Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014).   A "material fact" is a fact that

could affect the outcome of the case.   *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co.*

*v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   A "genuine issue"

concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to

return a verdict in the nonmoving party's favor.   *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir.

2013).

The moving party bears the burden of showing that there is no genuine issue of material

fact, and that it is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp.*,

---

deposition of Barry O'Bryan on August 7, 2013; (L) portions of the deposition of Roy Palmer on August 8, 2013, and one of the exhibits; (M) portions of the Rule 30(b)(6) deposition of Covol Fuels No. 4, LLC and Gina Rau on October 1, 2013, and several of the exhibits; (N) portions of the deposition of Donald S. Risher on September 12, 2013, and several of the exhibits; (O) portions of the deposition of John R. Shaal on July 11, 2013; (P) portions of the deposition of Donald Douglas Townsend on September 27, 2013 and several of the exhibits; (Q) portions of the deposition of D. Douglas Townsend on July 12, 2013, and several of the exhibits; (R) portions of the deposition of Darrell J. Turner on September 25, 2013, and several of the exhibits; (S) one portion of the deposition of Duke D. Vetor on September 24, 2013, and one of the exhibits; (T) one portion of the Rule 30(b)(6) deposition of Covol Fuels No. 4, LLC and Gina Rau on October 1, 2013; and (U) one portion of the deposition of Duke D. Vetor on September 24, 2013.

477 U.S. at 322–23.   When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party.   *Hoschar*, 739 F.3d at 169.   However, the nonmoving party must satisfy its burden of showing a genuine factual dispute by offering more than "[m]ere speculation" or a "scintilla of evidence" in support of its position.   *Anderson*, 477 U.S. at 252; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250.   On the other hand, if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."   *Celotex*, 477 U.S. at 322–23.

## III. DISCUSSION

### A.  *Breach of Contract*

In the first cause of action, Covol claims that Pinnacle breached the CPRRA.   The Court notes that neither party challenges that the CPRRA was a valid and enforceable contract, or that both parties were mutually bound by its terms.   The parties disagree, however, concerning the nature and extent of their respective rights and obligations pursuant to its terms.

Pinnacle asserts that it did not breach any express term of the CPRRA and argues that no implied or express term created a duty to lower the water level or provide Covol access to the refuse material in the impoundment.   Covol argues that it cannot access the refuse material

unless Pinnacle lowers the water level, and claims that the contract expressly and impliedly grants it the right to access and remove the refuse material.   Pinnacle replies that the contract defines the full extent of Covol's right of access as a limited right-of-way that "clearly does not obligate Pinnacle to lower the water level at Covol's demand."   (Document 113 at 3).

### 1. Express Terms of the CPRRA

Claims alleging breach of an unambiguous contract are "particularly suited for summary judgment disposal" because a court can "ascertain the meaning of the agreement as manifested by its language" and "enforce it as written."   *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999); *Fraternal Order of Police, Lodge No. 69 v. Fairmont*, 468 S.E.2d 712, 716 (W. Va. 1996).   The first step in a court's analysis is to decide as a matter of law whether the contract is ambiguous or not.   *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) ("The question as to whether a contract is ambiguous is a question of law to be determined by the court."); *see also Franklin v. Lilly Lumber Co.*, 66 S.E. 225 (W. Va. 1909).   A writing is ambiguous if it is "reasonably susceptible of two different meanings."   *Estate of Tawney v. Columbia Natural Res., LLC*, 633 S.E.2d 22, 28 (W. Va. 2006).   In addition, "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous." *Berkeley County Public Service Dist. v. Vitro Corp. of America*, 162 S.E.2d 189, 200 (W. Va. 1968).

If the language is unambiguous, it "must be construed according to [its] plain and natural meaning."   *Fraternal Order of Police*, 468 S.E.2d at 716.   A court may not use interpretation, construction, or extrinsic evidence to conceive any intention or obligation that contradicts the plain meaning of an unambiguous agreement.   *See Fifth Third Bank v. McClure Properties*,

*Inc.*, 724 F.Supp.2d 598, 605 (S. D. W. Va. 2010) (Chambers, J.); *see also Haynes v. DaimlerChrysler Corp.*, 720 S.E.2d 564 (W. Va. 2011) ("It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed" in an unambiguous contract.).   The court "may then properly interpret that contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." *Goodman*, 7 F.3d at 1126.

If the court determines that the contract is ambiguous, it should consider extrinsic facts "together with reasonable inferences extractable therefrom . . . to reveal the parties' discerned intent." *Energy Development Corp. v. Moss*, 591 S.E.2d 135 (W. Va. 2003). "[I]f the evidence is, as a matter of law, dispositive of the interpretative issue," then summary judgment of the ambiguous contract is appropriate. *Goodman*, 7 F.3d at 1126.   If the contract is ambiguous and extrinsic evidence reveals "there is more than one permissible inference as to intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact." *Atalla v. Abdul-Baki*, 976 F.2d 189, 192 (4th Cir. 1992) (citations and quotations omitted). "An ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact," rendering summary judgment inappropriate. *Sempione v. Provident Bank*, 75 F.3d 951, 959 (4th Cir. 1996).

The Court finds that the language of the CPRRA is clear and unambiguous.   The terms are straightforward, understandable, and definitive. They are not susceptible to more than one reasonable interpretation.   Further, the contract is the product of negotiations between sophisticated corporate parties, both represented by counsel.   Therefore, the Court will identify and enforce the plain and natural meaning of the language of the CPRRA.

15

Covol's assertion that Section(s) 1, 4, 8, and 18 of the CPRRA provide it with an express right of access to the refuse material in the impoundment is unavailing.   Section 1 of the CPRRA defines Covol's intentions in entering into the agreement. [17]   This section does not, by the plain and general meaning of its language, establish any obligation or duty on Pinnacle to provide an express right of access to the refuse material.   Section 4 of the CPRRA establishes and defines Covol's duty to Pinnacle to purchase and process some undefined amount of refuse material from Pinnacle's mining operations in Wyoming County, West Virginia.[18]   Covol appears to rely on the heading for Section 4, "Access, Obligations & Sale of Material," to argue that this section requires Pinnacle to provide Covol with a right of access to the refuse material. (Document 109 at 4-5.)   However, Section 30 of the CPRRA expressly forbids interpretation of the agreement based on its headings.   Thus, Pinnacle is not in breach of Section 4 of the CPRRA because that section does not impose any duty on Pinnacle to provide Covol with a right to access the refuse material.   Even assuming *arguendo* that Section 4 provides Covol with a right of access to the refuse material based on its express right to "purchase and process" the material, Pinnacle did not expressly agree to provide or allow Covol unrestricted access to the

---

[17]    Section 1 of the CPRRA states in relevant part:

*Covol represents that it desires* to remove and purchase all or part of the coal waste material . . . resulting from Pinnacle's previous, current or future Mining Operations . . . located at the Pinnacle refuse site in Wyoming County, West Virginia, and . . . *Covol represents that it desires* to transport the Refuse Material to the Processing Facility to be cleaned and to be sold as a clean coal product . . . .

(Document 21-2 at 1) (emphasis added).

[18]    Section 4 of the CPRRA states in relevant part:

*Covol agrees* to purchase and process, while this Agreement is in effect, all or part of the Refuse Material produced, previously, currently and any in the future, from Pinnacle's Mining Operations in Wyoming County, West Virginia." "*Covol, at its own expense,* will transport the Refuse Materials to Covol's Processing Facility.

(Document 21-2 at 3) (emphasis added).

16

entirety of the impoundment.

The Court finds that Section 18 of the CPRRA does impose several duties on Pinnacle.

That section states in relevant part:

> Pinnacle hereby agrees to permit Covol to operate the Processing Facility for recovery of the Refuse Material at the Refuse Site. Pinnacle shall provide to Covol: (i) a mutually agreeable area in the immediate vicinity of each fines pond that is adequate for Covol to install and maintain its Processing Facility and equipment for recover of Refuse Material; (ii) any right-of-way reasonably needed by Covol to transport the Refuse Material from the ponds to the processing facility; and (iii) ingress and egress over the property of Pinnacle or its lessors to support the activities described in this Agreement.

(Document 21-2 at 10.)   Covol asserts that the right-of-way in Section 18(ii) "necessarily extend[s] beyond the water's edge through the depth of the water."   (Document 109 at 17.) However, allowing Covol access to the bottom of the impoundment pond does not require Pinnacle to affirmatively lower the water level.   The Court will not impose an additional duty or right that is not expressed by the plain language of an unambiguous contract.   *See Fifth Third*, 724 F.Supp.2d at 605-06.   Therefore, the Court finds that Pinnacle is not in breach of Section 18 of the CPRRA as a matter of law.

Covol also argues that Section 8 of the CPRRA requires Pinnacle to lower the water level in the impoundment pond in accordance with certain mining plans submitted to MSHA and the WVDEP. [19]   (Document 109 at 17-19.)   The relevant MSHA plan is MSHA I.D. No. 1211-WV04-00700-01, and it was eventually modified on July 13, 2010, to allow an operator to "recover fine coal refuse in the impoundment between elevations 1755 feet and 1905 feet, in six phases of 25 vertical feet each."   (Document 109-1 at 418.)   Covol apparently wishes to

---

[19]   Section 8 of the CPRRA states, in relevant part, that "Pinnacle shall maintain its existing permits that are required for its performance under this Agreement."   (Document 21-2 at 5.)

incorporate this MSHA plan by reference into the CPRRA.   However, the language of the CPRRA does not contain the necessary legal specificity to incorporate the MSHA and/or WVDEP permits and plans into the CPRRA by reference.

Pursuant to West Virginia law, "a general reference in one writing to another document is not sufficient to incorporate that other document into a final agreement."   *State ex rel. U-Haul Co. of West Virginia v. Zakaib*, 752 S.E.2d 586, 598 (W. Va. 2013).   The language in the CPRRA regarding Pinnacle's mining plans and permits is nothing more than an "oblique reference to a separate, non-contemporaneous document" and, as such, is insufficient to incorporate into the parties' agreement.   *Id.* at 595.   The CPRRA itself does not make a detailed reference to any plan or permit identification number, and there is no addendum attached which would otherwise indicate which permit or plan the CPRRA is incorporating by reference.   Therefore, Covol's argument that Pinnacle owes a contractual duty to Covol to lower the water level in the impoundment pond based on reference to, and representations in, its plans and permits is unavailing.

In sum, the Court "will not use the vehicle of interpretation to relieve one party of a bad bargain."   *Pechenik v. Baltimore & O. R. Co.*, 205 S.E.2d 813, 815 (W. Va. 1974).   Covol does not cite to any portion of the CPRRA that imposes a duty or obligation on Pinnacle to lower the water level in the impoundment.   Instead, the contract requires Pinnacle to "permit Covol to operate the Processing Facility," provide Covol with "any right-of-way reasonably needed by Covol to transport the Refuse Material from the ponds to the processing plant," and allow Covol ingress and egress over Pinnacle's property. Having reviewed the plain and natural meaning of these contractual terms, there is no evidence presented to indicate that Pinnacle failed to comply

18

with any of its obligations under the CPPRA.   Therefore, the Court finds that Pinnacle is entitled to summary judgment on the express breach of contract claim.

### 2.   *Common Law or Implied Right to Access*[20]

Pinnacle next argues that Covol's rights are "solely governed" by the express language of the CPRRA, which does not require Pinnacle to "control the water level for Covol's benefit or grant[] Covol any right to demand that Pinnacle raise or lower the water level."   (Document 105 at 13-14.)   Covol counters that the terms of the CPRRA "collectively evidence" a right to access the refuse material because doing so was a "necessary predicate" to achieving the "fundamental purpose" of the CPRRA.   (Document 109 at 16-17.)   Covol supports this argument with deposition testimony from Mr. William Boor, "Pinnacle's Rule 30(b)(6) witness on the terms of the CPRRA."[21]   (*Id.* at 5-6).   Pinnacle counters that the rights and obligations within the CPRRA are "limited to its freely-negotiated terms," which "say[] nothing about adjusting the water level in the impoundment."   (Document 113 at 3.)

As noted *supra*, the Court will not create or impose an additional duty or right that is not

---

[20]         In its complaint, Covol claims an "enforceable common law right of access to mine the coal estate granted by Pinnacle" and that "Covol's common law rights secure access to the coal in the impoundment . . . ."   (Compl. ¶ 22.)   Pinnacle counters that "the evidence demonstrates that the CPRRA is a bare license to mine that carries with it no implied rights of access as a matter of law."   (Document 105 at 13.)   Covol appears to have abandoned this common law right of access argument, as the claim is absent from Covol's response.   (*See* Document 109.)   For reasons similar to those articulated by Pinnacle in its motion for summary judgment, the Court does not find a legal basis for Covol's alleged common law right to access.

[21]         Mr. Boor stated the following in his deposition:

> Q. Sure. It wouldn't make any sense for Covol to enter into an agreement where it wasn't allowed to have access to the material in the impoundment pond, would it?
> . . .
> A. Yeah, that would be no deal. I mean, the purpose of the deal was for their business plan to clean coal.
> Q. And to clean the coal you had to have access to the coal, correct?
> . . .
> A. Yes.

(Document 109-1 at 6-7; Exhibit A, 69:18-70:5.)

expressed by the plain language of the parties' unambiguous and fully integrated contract.[22]
*See Fifth Third*, 724 F.Supp.2d at 605-06.    Further, "[e]xtrinsic evidence will not be admitted to
explain or alter the terms" of the unambiguous CPRRA.    Syl. pt. 6, *Faith United Methodist
Church and Cemetery of Terra Alta v. Morgan*, 745 S.E.2d 461 (W. Va. 2013); *see also Iafolla v.
Douglas Pocahontas Coal Corp.*, 250 S.E.2d 128, 135 (W. Va. 1978) (finding that "extrinsic
evidence is not . . . sufficient . . . to vary the plain and unambiguous provisions" of a contract,
especially when the parties are corporate entities represented by counsel).    The Court "will not
use . . . testimony to add terms," rights, or duties to the CPRRA.    *Fifth Third*, 724 F.Supp.2d at
606.    Covol's implied right of access claim necessarily involves reading an additional term into
the parties' contract to find an "implied" right that the parties intended, but failed to express.
Therefore, Pinnacle is entitled to judgment as a matter of law on Covol's claim of implied right
of access.

Even assuming *arguendo* that the CPRRA as a whole establishes an implied duty that
Pinnacle provide Covol with a right to access the refuse material, the Court is not persuaded that
Pinnacle materially breached such an obligation.    When Pinnacle upgraded the wash plant and
changed the water management system, these actions undoubtedly made it more difficult for
Covol to access the refuse material and thereby profit from operating the processing plant.
However, Covol was never denied *access* to the refuse material.    Covol simply had to deal with
more water in the impoundment where the refuse material was located.    Tellingly, Section 20 of
the CPRRA explicitly disclaims any warranty regarding the quantity or quality of the refuse

---

[22]    Section 28 of the CPRRA states, in relevant part, that the contract "embodies the entire understanding
between the Parties with respect to the subject matter hereof and supersedes all prior negotiations, representations,
understandings or other writings."    (Document 21-2 at 15-16.)

material and the suitability of its property for the operation of Covol's processing plant.[23]

Pinnacle may have made business decisions that ultimately made Covol's operations more

difficult, but no evidence indicates that Pinnacle breached the CPRRA.

### 3.  Implied Covenant of Good Faith and Fair Dealing

Pinnacle argues that the implied covenant of good faith and fair dealing "does not give

Covol any rights inconsistent with those rights expressly provided for" in the CPRRA.

(Document 105 at 19.)   Because Pinnacle did not violate any of Covol's rights under the

CPRRA, Pinnacle argues it is not in breach of the implied covenant as a matter of law.   (*Id.* at

20.)   Covol responds that an implied covenant of good faith and fair dealing is automatically

incorporated in the CPRRA, and asserts that changing the water management system so that the

water could not be lowered and Covol could not receive the benefit of the contract constitutes a

breach.   "If Covol wanted to impose an unfettered duty on Pinnacle to raise and lower the water

level in the Impoundment at Covol's whim and for Covol's sole benefit," Pinnacle argues,

"Covol should have ensured that the CPRRA contained a provision imposing that duty."

(Document 113 at 10.)

It is true that West Virginia law incorporates an implied covenant of good faith and fair

dealing into every contract.   *Fifth Third*, 724 F.Supp.2d at 609.   Further, "good faith" is

---

[23]     Section 20 of the CPRRA states in relevant part:

> Pinnacle makes no representation as to the character or quality or amount of the Refuse Material
> Covol removes or receives. Pinnacle HEREBY DISCLAIMS ANY WARRANTIES, EXPRESS
> OR IMPLIED, IN CONNECTION WITH THE REFUSE MATERIAL. . . . Pinnacle has not made
> any representation or warranty to Covol regarding the suitability or safety of Pinnacle's property
> for the processing of the Material as contemplated by this Agreement. . . . Covol represents that it
> is an independent contractor *and is willing to accept the risks associated with the safety or
> suitability of Pinnacle's premises for the Material processing contemplated by this Agreement.*

(Document 21-2 at 11-12) (first emphasis in original) (second emphasis added).

defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." W. Va. Code § 46-1-201(b)(20). Notably, the implied covenant of good faith does not provide a cause of action separate from breach of contract. *Highmark W. Va. Inc. v.* Jamie, 655 S.E.2d 509, 514 (W. Va. 2007).

Here, the implied covenant of good faith requires Pinnacle to act within "reasonable commercial standards of fair dealing" when performing its duties under the CPRRA. *See Fifth Third*, 724 F.Supp.2d at 609. The Court finds no genuine dispute of material fact concerning whether Pinnacle met the standard of reasonable fair dealing when managing the selenium pollution issue. Having previously found that Pinnacle did not breach any duty – express or implied – of the CPRRA, there is no avenue through the applicable case law that affords Covol an independent cause of action for a breach of the covenant of good faith and fair dealing. Simply put, here the implied covenant of good faith and fair dealing "cannot give contracting parties rights which are inconsistent with those set out in the contract." *Barn-Chestnut, Inc. v. CFM Dev. Corp.*, 457 S.E.2d 502, 509 (W. Va. 1995). Thus, the Court finds that Pinnacle is entitled to summary judgment on the claim for breach of the implied covenant of good faith and fair dealing.

B. *Fraudulent Concealment and Negligent Misrepresentation*[24]

Pinnacle advances three reasons why Covol's fraudulent concealment and negligent misrepresentation claims must fail as a matter of law. First, Pinnacle argues that Covol cannot recover under a West Virginia common law tort claim because its claims arise from the same subject matter covered by the CPRRA. (Document 105 at 21-22.) Second, Pinnacle contends

---

[24]     Counts Two and Three of Covol's complaint are based on the same alleged facts, so the Court considers them here contemporaneously. Both parties do the same in their respective motion for summary judgment and response.

that there was never a relationship between the parties that would prompt an affirmative duty to disclose.   (*Id.* at 22-23.)   Third, Pinnacle asserts that Covol's alleged reliance on Pinnacle's silence was unreasonable and unjustifiable based on the timing of Pinnacle's changes and Covol's investments.   (*Id.* at 21-26.)   Pinnacle argues that Covol purchased and upgraded the waste processing facility before Pinnacle decided to upgrade the wash plant and change the water management system.[25]   (*Id.* at 23.)   In addition, Pinnacle asserts that by the time Covol chose to proceed with the excavation project, Covol "kn[ew] full well about the changes to the water management system and the planned upgrade to Pinnacle's Wash Plant."[26]   (*Id.* at 23-24.)

Covol alleges that Pinnacle's actions and omissions constitute "extra-contractual, common-law fraud."   (Document 109 at 25.)   Covol argues that Pinnacle intentionally concealed crucial information regarding its wash plant upgrade and selenium management plan when Covol was contemplating both the purchase of the waste processing facility and the later excavation project.   (*Id.*)   In support, Covol cites deposition testimony from Barry O'Bryan, a plant superintendent at Pinnacle, who stated that "[t]he original plan for the upgrades [to Pinnacle's wash plant] actually started in 1997," a decade before Covol purchased the processing

---

[25]     It is undisputed that the parties entered into the CPRRA in February of 2008.   (Document 21-2 at 1.) Pinnacle provides evidence that the wash plant upgrade project was presented to Pinnacle's board of directors in November of 2009.   (Document 113-20 at 7.)   It is undisputed that Pinnacle did not upgrade its wash plant until 2010.   (Document 105 at 8.)   In addition, Pinnacle argues that it "did not face any government action regarding selenium, which necessitated its change to its water management system" until March, 2010, when the DEP denied the company's request for an extension of its compliance date.   (Document 105 at 24; *see also* Document 104-7 at 9; Exhibit G, 139-40) (deposition testimony from John Flegel and accompanying exhibits confirming the DEP's denial of Pinnacle's request for an extension in March of 2010).

[26]     Covol's management approved the excavation project in October of 2010.   (*See* Document 104-8 at 39; Exhibit H, 176:14-18.) Darrell Turner, a manager at Covol, stated in deposition that Covol was aware of Pinnacle's plan to upgrade its wash plant by July 2010.   (Document 104-23 at 33; Exhibit R part 1, 293:14-18) (Q:   "So is it fair to state that as of July of 2010, you were aware of the fact that Cliffs was planning to do an upgrade at their preparation plant?"   A:   "Yes.").   Covol's Rule 30(b)(6) witness, Gina Rau, admitted that Covol was aware of Pinnacle's selenium issue and had received Barr's draft report, which included the water treatment option, by August 2010.   (*See* Document 104-17 at 37-39; Exhibit L at 151-53.)   The Court notes that Pinnacle does not provide evidence that it shared Barr's final report, which recommended water management, with Covol before the excavation project took place.

plant.   (*Id.* at 26; Document 109-1 at 92; Exhibit F, 109:13-14.)   Covol also argues that it only received Barr's draft report, which recommended water treatment instead of water management, and not the final report recommending water management, *before* beginning the excavation project.   (Document 109 at 27.) (emphasis added.)   Finally, Covol asserts that Pinnacle repeatedly misrepresented that it "could and would lower the water levels in the impoundment," and that Covol reasonably relied on those misrepresentations to its detriment.[27]   (Document 109 at 27-28) (emphasis removed).

In reply, Pinnacle again stresses that Covol's claims arise from the CPRRA and therefore are not recoverable under tort law; that Covol and Pinnacle were not in a special relationship that would prompt a duty to disclose; that Pinnacle did not have plans to upgrade the wash plant or change the water management system before Covol purchased the waste processing facility and that Covol was informed of the wash plant upgrades and selenium pollution issue before approving the excavation project.   (Document 113 at 11-16.)

The elements of fraudulent misrepresentation mirror the well-established elements of fraud: (1) the fraudulent act was committed or induced by the defendant himself; (2) the act was "material and false," the plaintiff relied on it, and the plaintiff's reliance was "justified under the circumstances;" and (3) the plaintiff suffered damage from his reliance.   *Trafalgar House Const., Inc. v. ZMM, Inc.*, 567 S.E.2d 294, 300 (W. Va. 2002); *see also Ochala v. Dyncorp Int'l LLC*, 2009 WL 4152966, *5 (S. D. W. Va. 2009) (Chambers, J.).   If the fraudulent misrepresentations "contributed to the formation of the conclusion in the plaintiff's mind," then the actual reliance element is met.   *Trafalgar*, 567 S.E.2d at 301.

---

[27]     Covol relies on the MSHA plans that provided for lowering the water level in the impoundment to support this assertion.   (Document 109 at 6-8.)

Fraudulent concealment, on the other hand, requires: (1) the concealment of facts by the one with knowledge of those facts; (2) a duty to disclose; and (3) "an intention to mislead or defraud."   *Trafalgar*, 567 S.E.2d at 300; *see also Kessel v. Leavitt*, 511 S.E.2d 720, 753 (W. Va. 1998) ("[A]ctive concealment of information from a party with the intent to thwart that party's efforts to conduct an investigation, relating to such information, constitutes actionable fraudulent concealment.")

Finally, negligent misrepresentation requires that: (1) the defendant "represented a matter as being true;" (2) the defendant "had no knowledge of the truth of his representation;" (3) the representation was false; and (4) the plaintiff "relied on the false representation to his detriment." *Kerns v. Range Res.–Appalachia, LLC*, 2011 WL 3753117, *7 (N. D. W. Va. 2011) (citing *Folio v. Clarksburg*, 655 S.E.2d 143, 151 (W. Va. 2007)).

Under the West Virginia gist-of-the-action doctrine, "whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the contract."[28]   *Gaddy Engineering Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 577 (W. Va. 2013).   "A tort claim arising from a breach of contract may be pursued only if the action in tort would arise independent of the existence of the contract." *Id.* (internal quotation omitted).   "Recovery in tort will be barred . . . when the alleged duties breached were grounded in the contract itself."   *Gaddy*, 746 S.E.2d at 577; *see also Silk v. Flat*

---

[28]    The gist-of-the-action doctrine bars recovery with a tort claim when any of the following is found:

(1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*Gaddy*, 746 S.E.2d at 577.

*Top Const., Inc.*, 453 S.E.2d 356, 360 (W. Va. 1994) ("Tort law is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement.") (internal quotation omitted).

The Court finds that Pinnacle is entitled to summary judgment on Covol's claim for fraudulent concealment and negligent misrepresentation.   In essence, Covol is claiming that Pinnacle is liable for failing to disclose its plans to upgrade its wash plant.   This argument is based on a claim for fraudulent inducement, which requires that (1) Pinnacle induced Covol to enter into the CPRRA (2) by false representations (3) Pinnacle knew, or had a duty to know, were untrue.   *Folio v. Clarksburg*, 655 S.E.2d 143, 150 (W. Va. 2007).   The Court is not persuaded that failing to disclose general plans to upgrade the wash plant constitutes a false representation.   Importantly, Covol has not produced any evidence that it inquired about the wash plant or any plans to upgrade it, or that Pinnacle had actively concealed plans from Covol during due diligence or the execution of the CPRRA.   Equally important, Covol's tort claims are barred by the gist-of-the-action doctrine articulated in *Gaddy*, as they would not arise independent of the existence of the CPRRA.   Again, the Court must look to the unambiguous language of the contract to define the relationship between the parties.   As mentioned *supra*, in Section 20, Pinnacle expressly disclaimed any representation or warranty regarding the suitability of the premises for processing the refuse material, and Covol expressly agreed to accept the risks associated with the suitability of Pinnacle's premises for processing the refuse material.   Additionally, pursuant to Section 12, Covol had the unilateral right to, "in its reasonable discretion, terminate this Agreement if Covol reasonably determines that it is not economically feasible to continue to purchase and process the Refuse Material."   (Document

21-2 at 7.)   Therefore, the Court finds that Pinnacle is entitled to summary judgment on the fraudulent concealment and negligent misrepresentation claims.

### C.  Unjust Enrichment

Finally, Pinnacle argues that Covol's unjust enrichment claim must fail as a matter of law because Covol cannot establish genuine evidence that Pinnacle benefitted from the excavation project.   (Document 105 at 26.)   Pinnacle also claims to have expressly rejected any proposed agreement to share the expenses, which it argues defeats any suggestion that Covol is equitably entitled to receive payment for the excavation.[29]   (*Id.* at 28.)   Covol responds with deposition testimony from Barry Dangerfield, the Senior Director of Coal Projects at Pinnacle's parent company, who stated that Covol's excavation project "wasn't negative for us," and that "we got some benefit, too . . . ."   (Document 109-1 at 62; Exhibit D, 237:4-11.)   Shortly after the excavation project was completed, Covol could no longer access the refuse material as planned due to Pinnacle's new water management system.   Covol stresses that Pinnacle did agree to pay.   (Document 109 at 18.)   In reply, Pinnacle continues to maintain that it did not receive

---

[29]     Covol proposed to Pinnacle in November of 2011 that the parties amend the CPRRA to address splitting the cost of the excavation project *after* Covol had begun the project.   In his deposition, Covol manager Darrell Turner stated:

> Q. So is it fair to state that it was on November 1, 2011 that you submitted the proposed changes to the contract to address the spoil removal issue?
> A. The context was that we had an extended period of time where we could not get any response from Duke Vetor so this, our sending the proposed changes again were in response to my email below on November 1st, 2011.
> . . .
> Q. And I believe you already testified, at least as far as you know, this was never signed by the parties, correct?
> A. Correct.
> Q. And at this point in time the spoil removal project was well underway and I think you testified there, monies had already been expended by Covol for the project, right?
> A. Yes.

(Document 104-23 at 39-40; Exhibit R part 1, 319:16-320:11.)

any benefit from the excavation project and never agreed to pay any portion of the costs. (Document 113 at 19-20.)

In West Virginia, the claim of unjust enrichment has three elements: (1) a benefit bestowed upon the defendant; (2) knowledge of such benefit by the defendant; and (3) "the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Cumis Ins. Soc'y, Inc. v. Raines*, 2013 WL 500305, *2 (S. D. W. Va. 2013) (Chambers, J.); *see also Realmark Developments, Inc. v. Ranson*, 542 S.E.2d 880, 884-85 (W. Va. 2000). Regarding improvements to real property, the West Virginia Supreme Court has held that "if one person improves the land of another . . . through the direction of services to the land . . . that person is entitled to restitution for the improvements if certain other circumstances are present." *Realmark*, 542 S.E.2d at 884. "Such" or "certain other" circumstances include, among others: (1) a fraudulent misrepresentation by the defendant; (2) an innocent misrepresentation by the defendant upon which the plaintiff justifiably relied; or (3) when the plaintiff mistakenly believes that payment was secured by a valid contract. *Id.; see also Veolia Es Special Services, Inc. v. Techsol Chemical Co.*, 2007 WL 4255280, *9 (S. D. W. Va. 2007) (Chambers, J.).

The Fourth Circuit, interpreting West Virginia law, held that a party to a valid contract "cannot recover under an unjust enrichment theory for the services it rendered under [a] preexisting express contract[]." *Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir. 1994). The court reasoned that because an integrated contract exclusively governs the rights and available remedies regarding the subject matter thereof, a "quasicontractual" unjust enrichment claim "may not be brought in the face of an express contract." *Id.* (internal quotation omitted). If

28

the plaintiff's actions and the benefit to the defendant "fell within the scope" of their express contract, then recovery under unjust enrichment is barred.[30]   *Id.*

Covol undertook the excavation project so that it could "access more minable [refuse] material" in performance of its rights and duties under the contract.   (Document 109 at 13.) As such, the excavation project—as well as any alleged benefit conferred to Pinnacle—falls within the scope and subject matter of the parties' written contract.[31]   Therefore, any remedy to recover the costs of the excavation project must be found within the four corners of the CPRRA. *See Bright*, 20 F.3d at 1306-08 (denying recovery for unjust enrichment for "expenses to improve [the party's] own contractual performance").   If Covol desired or expected Pinnacle to share the cost of its excavation project, "it should have bargained for such terms and embodied them in [the] contract."[32]   *Id.* at 1308.   The uncontested evidence presented here suggests that Covol did try to amend the CPRRA to include the excavation project, but that Pinnacle expressly declined.

Instead, Covol agreed to "accept the risks associated with the . . . suitability of Pinnacle's

---

[30]      The Fourth Circuit concluded:

> When the dust is settled, this case presents nothing more than two sophisticated parties engaged in a supplier-distributor relationship governed by written contracts. Through contract, the parties have established the scope of their benefits and the limits of their liabilities, thereby injecting predictability and regularity into their relationship. . . . If [the plaintiff] had desired a higher price for its services or reimbursement for its actual costs, it should have bargained for such terms and embodied them in contract.

*Bright*, 20 F.3d at 1308.

[31]      In fact, Covol sought to amend the CPRRA and add a clause requiring Pinnacle pay for a portion of the excavation project.   (Document 105 at 27-28) (citing deposition testimony from Darrell Turner, a manager at Covol, stating that Covol's proposed amendment was never executed (Document 104-23 at 38-40; Exhibit R part 1, 318-20)).

[32]      Covol admits that it communicated to Pinnacle its intentions to perform the excavation in October of 2008. (Document 109 at 13.)   Pinnacle claims that only once the excavation project was nearing completion, "Covol attempted to negotiate an agreement with Pinnacle to pay for half of the project and prepared a proposed amendment" to the parties' contract, which Pinnacle rejected.   (Document 105 at 10.)   Covol does not dispute these facts.   (Document 109 at 14.)

premises" for removing and processing refuse material.   (Document 21-2 at 12.)   Thus, the subject matter of this claim involves the performance of an express contract, and as such, cannot be the basis of an unjust enrichment claim.   Accordingly, the Court finds that Pinnacle is entitled to summary judgment on the unjust enrichment claim.


## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court hereby **ORDERS** that the *Defendant Pinnacle Mining Company, LLC's Motion for Summary Judgment* (Document 104) be **GRANTED.**   The Court further **ORDERS** that any outstanding motions be **TERMINATED AS MOOT**, and that this matter be **STRICKEN** from the docket of this Court.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:        April 9, 2014

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

30