IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

COVOL FUELS NO. 4, LLC,

        Plaintiff,

v.                                    CIVIL ACTION NO.   5:12-cv-04138

PINNACLE MINING COMPANY, LLC,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Defendant Pinnacle Mining Company, LLC's Daubert Motion to Exclude the Report and Testimony of Vincent Thomas* (Document 241), the *Memorandum in Support* (Document 242), and the *Plaintiff's Memorandum in Opposition* (Document 252). For the reasons set forth herein, the Court finds that the motion should be denied.

**INTRODUCTION**

The facts and procedural history of this case have been set forth repeatedly by this Court in prior orders, and thus, the Court will provide only a brief summary of the procedural posture and the relevant issues in this litigation. The Plaintiff brought suit in this Court on August 7, 2012, alleging that the Defendant had breached the terms of a Coal Purchase and Refuse Recovery Agreement (CPRRA) between the parties, dated February 15, 2008. (Pl's Complaint, at ¶35-39.) The Plaintiff alleged that the CPRRA required the Defendant to provide "access" to coal refuse within an impoundment pond adjacent to an underground coal mine operated by the Defendant in Wyoming County, West Virginia. (*Id*.) The Plaintiff also alleged that the Defendant breached

the implied covenant of good faith and fair dealing. (*Id*.) The Defendant moved for summary judgment, and this Court issued a *Memorandum Opinion and Order* (Document 153) on April 9, 2014, granting summary judgment in favor of the Defendant on all claims.

The Plaintiff appealed, and on March 3, 2015, the Fourth Circuit issued its *Opinion* (Document 177). The Fourth Circuit found there were "genuine issues of material fact" with respect to the Plaintiff's claim for breach of contract, and that Section 18(ii) of the CPRRA,[1] read alone and in the context of other provisions in the CPRRA, was susceptible to multiple meanings. (4CCA Opinion, at 17.) The Fourth Circuit, therefore, remanded the case to this Court for a trial to determine whether Section 18(ii) of the CPRRA required the Defendant to affirmatively lower the water level in the impoundment pond. The Fourth Circuit also determined that there were "factual issues" concerning whether Section 7 of the CPPRA[2] required the Defendant to comply with the terms of federal Mine Safety and Health Administration (MSHA) and West Virginia Department of Environmental Protection (DEP) mine plans. (*Id*. at 21-22.) Finally, the Fourth Circuit found that the Defendant was not entitled to summary judgment on the Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. (*Id*. at 23.)

---

[1] Section 18 of the CPRRA provides, in relevant part, that "[the Defendant] hereby agrees to permit [the Plaintiff] to operate the Processing Facility for recovery of the Refuse Material at the Refuse Site. [The Defendant] shall provide to [the Plaintiff]: (i) a mutually agreeable area in the immediate vicinity of each fines pond that is adequate for Covol to install and maintain its Processing Facility and equipment for recovery of Refuse Material; (ii) any right-of-way reasonably needed by [the Plaintiff] to transport the Refuse Material from the ponds to the processing plant; and (iii) ingress and egress over the property of Pinnacle or its lessors to support the activities described in this Agreement. (CPPRA, at 18, att'd as Exh. 2 to Def. Answer.) (Document 21-2).

[2] Section 7 of the CPRRA states, in relevant part, that "[i]n performing their respective obligations under [the CPRRA], [the Plaintiff] and [the Defendant] shall comply in all respects with and undertake all responsibilities under all applicable statutes, laws, ordinances, enactments, rules, regulations, orders, decrees, directives, mandates, or other similar requirements of any federal, state or local government, agency, court or public authority …" (CPRRA, at 4.)

In accordance with the Fourth Circuit's *Opinion*, this Court entered an Order (Document 184) lifting the stay of this action on April 9, 2015. The remaining issues before the Court in this litigation are (1) whether the Defendant breached Section 18(ii) of the CPRRA, (2) whether Section 7 of the CPRRA required the Defendant to comply with MSHA and DEP mine plans, and (3) whether the Defendant breached the implied covenant of good faith and fair dealing.

Following remand, the parties completed discovery. Trial is scheduled for February 28, 2016. The Defendant filed the present motion on October 5, 2015, and the Plaintiff responded on October 19, 2015. The motion is ripe for review.

## APPLICABLE LAW

The admissibility of expert testimony in federal court is governed by Federal Rule of Evidence 702. Rule 702 provides that a district court shall permit a witness "who is qualified as an expert" on the basis of "knowledge, skill, experience, training or education" to testify under certain circumstances. Fed. R. Evid. 702. Specifically, Rule 702 permits experts to testify where the expert's "scientific, technical, or other specialized knowledge" will assist jurors in "understand[ing] the evidence" or "determin[ing] a fact in issue, the testimony is "based on sufficient facts or data," and the expert applied "reliable principles and methods" to the facts of the case. *Id.* The Fourth Circuit considers Rule 702 to be a liberal standard of admissibility. *See, e.g.*, *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) ("Rule 702 is broadly interpreted, and helpfulness to the trier of fact is its touchstone.") Expert testimony is therefore presumed to be "helpful" unless it "concerns matters within the everyday knowledge and experience of a lay juror." *Id.* (citing *Persinger v. Norfolk & Western Railway Co.*, 920 F.2d 1185, 1188 (4th Cir. 1990)).

3

The Supreme Court has positioned trial courts as the "gatekeeper" for expert testimony, and instructed trial courts to ensure the proffered testimony is both reliable and "relevant to the task at hand." *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire v. Carmichael*, 526 U.S. 137, 147 (1999); *Cooper v. Smith & Nephew*, 259 F.3d 194, 199 (4th Cir. 2001). Under Federal Rule of Evidence 104(a), when a party challenges the admissibility of expert testimony, the party which proffers the testimony bears the burden of establishing, by a preponderance of the evidence, that the evidence is admissible. Fed. R. Evid. 104(a); *see also Daubert*, 509 U.S. at 592 n.10.

In assessing an expert's reliability, the trial court may consider the factors set forth by the Supreme Court in *Daubert*: whether the expert's theory or technique can be tested, whether the technique has been subject to peer review and publication, the known or potential rate of error, and whether the theory or technique is generally accepted in the scientific or technical community. *Kumho Tire*, 526 U.S. at 149-150, citing *Daubert*, 509 U.S. at 592-594. However, these factors are not exclusive. Courts have flexibility in assessing the reliability of expert testimony, and the analysis must be "tied to the facts" of the case at hand. *Kumho Tire*, 526 U.S. at 150. Thus, a trial court has "leeway" to "decid[e] in a particular case how to go about determining whether particular expert testimony is reliable." *Id*. at 152. In the Fourth Circuit, a proffered expert must possess specialized knowledge, skills or education which are "not in possession of the jurors." Even if the proffered testimony appears "shaky," the Supreme Court has instructed trial courts to consider that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

4

Similarly, when assessing the relevance of expert testimony, the proffered scientific or technical testimony must "fit" the case, by having a "valid … connection to the pertinent inquiry" before the Court. *Daubert*, 509 U.S. at 591. If the expert testimony "relate[s] to any issue in the case," the testimony is relevant. *Id*.

## DISCUSSION

The Defendant seeks to exclude the report and testimony of the Plaintiff's proffered damages expert, Vincent Thomas. In so moving, the Defendant makes a number of arguments. The Court finds that none of the arguments have merit, and that Mr. Thomas' reports and testimony are reliable, relevant, and admissible at trial.

*A) Scientific, Technical or Other Expertise or Knowledge*

The Defendant does not overtly contest the credentials or expertise of Mr. Thomas. Nevertheless, in keeping with the Court's gatekeeping function under Rule 702, *Daubert* and the subsequent case law, the Court will briefly discuss this issue. In reviewing the reports drafted by Mr. Thomas and proffered by the parties in their briefings on this motion, and in reviewing his sworn deposition, the Court finds that Mr. Thomas possesses technical expertise and knowledge which go above and beyond that which could reasonably be expected from a lay juror.

The Plaintiff has proffered that Mr. Thomas was retained for three reasons: (1) to review and provide an opinion on the Plaintiff's historical financial performance; (2) to assess and opine on the amount of economic damages the Plaintiff suffered as a result of the harms alleged in this case, and (3) to assess and provide an opinion on the revenue the Plaintiff generated for the Defendant under the CPRRA. (Pl's Mem. in Opposition, at 4.) To fulfill these expectations, Mr. Thomas is able to rely on "extensive experience in damages calculations and sophisticated

5

economic analyses," and his prior testimony on similar matters in "scores of cases." (*Id*. at 3.) He is a certified public accountant and a certified valuation analyst, and is accredited in business valuation and certified in financial forensics. (*Id*. at 4.) It is therefore indisputable that Mr. Thomas possesses the type of expertise contemplated by Rule 702 and *Daubert*, and that he is qualified to provide expert testimony on issues germane to this litigation.

  *B) Reliability*

  The Defendant seeks to exclude Mr. Thomas' testimony on the grounds that his methodology in calculating the Plaintiff's potential damages was unreliable as a general rule, and unreliable when applied to the facts in this litigation. (Def. Mem. in Supp. of Mot. to Exclude, at 11.) In arguing the unreliability of Mr. Thomas' opinions, the Plaintiff first claims that Mr. Thomas "arbitrarily" used the weighted average cost of capital (WACC) of the Plaintiff's parent company as a discount rate when calculating projected future cash flow. (*Id*. at 12.) The Plaintiff argues that "an accurate discount rate" is highly important, because "an award of damages is a sum certain that replaces a stream of earnings that is highly uncertain …" (*Id*., quoting *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F.Supp. 2d 870, 894 (E.D. Wis. 2010) (internal citations omitted).) The Defendant argues that this discount rate is "inappropriate" because the Plaintiff and the Plaintiff's parent company "are not in the same business" and, therefore, have distinct risk profiles, a fact that the Defendant claims was unknown to Mr. Thomas at the time of his deposition. In support of this claim, the Defendant cites a 2011 10-K filed by the Plaintiff's parent company, which stipulates that the parent "operat[es] in the light and heavy building materials sectors." (*Id*.) Because Mr. Thomas allegedly used a discount rate for a company which assembles building products, rather than a company which, like the Plaintiff, is engaged in the recovery of coal fines,

6

the Defendant argues that his methodology in calculating the Plaintiff's potential damages was unreliable, and in violation of Rule 702. (*Id.*)

As an initial matter, the Court finds that the use of the WACC as a discount rate was appropriate under Fourth Circuit precedent. *See, e.g.*, *United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 530 (4th Cir. 1999) (finding that district court properly used WACC as a discount rate in calculating economic benefit under the Clean Water Act). The Court further finds that Mr. Thomas thoroughly examined and explained his use of the discount rate for the Plaintiff's parent company. In his 2013 Rebuttal Report, Mr. Thomas stated that it was highly likely that, but for the Defendant's alleged misconduct, the Plaintiff would be able to earn significant profits by recovering coal files from the impoundment. (Thomas 2013 Rebuttal Report, at 34-35, att'd as Exh. 8 to Def. Mot. to Exclude.) While finding that the Plaintiff's business model was very low risk, Mr. Thomas nevertheless adopted a "more conservative" discount rate when calculating the Plaintiff's damages—the discount rate for the Plaintiff's parent corporation. (*Id.*) Mr. Thomas provided abundant evidence as to why this approach was analytically sound, including the fact that because the Plaintiff was a subsidiary of the parent, it was important for him to select a discount rate which accurately reflected the Plaintiff's capital structure. (*Id.* at 36.) The Court finds, in keeping with the liberal admissibility standards of *Daubert* and Rule 702, that the Plaintiff has established the reliability of Mr. Thomas' methodology by a preponderance of the evidence, and that his testimony and conclusions as to the Plaintiff's lost profits are admissible.

The Defendant further objects to Mr. Thomas' methodology on the grounds that he "made the unjustifiable decision to disregard the amounts that are due to [the Plaintiff] for the sale of its assets" to another coal refiner. (Def. Mem. in Supp. of Mot. to Exclude, at 13.) While Mr.

7

Thomas testified at his deposition that his damages model accounted for funds which the Plaintiff has received from the sale to date, he also testified that it did not account for funds which the Plaintiff was still owed. (*Id*.) The Defendant notes that Mr. Thomas testified that "it would be unfair for [the Plaintiff] to accept the risk" of the purchaser failing to pay for the balance of the assets, but argues that this "notion of fairness … is a far cry from the 'reliable foundation' that Rule 702 requires." (*Id*.) As the Plaintiff observes, Mr. Thomas made a careful investigation into the likelihood that the Plaintiff will receive future payments from the sale of the assets. (Pl's Mem. in Opp. to Mot. to Exclude, at 16.) He concluded that it was unlikely that the Plaintiff would receive additional compensation. (*Id*.) The Court finds no reason to question the reliability of the methods Mr. Thomas used in reaching this conclusion. Further, the Court finds that the Defendant's disagreements ultimately lie with Mr. Thomas' conclusions, rather than his methodology, and that as such, the appropriate tool for addressing these grievances is cross-examination.

The Defendant's final objection to Mr. Thomas' methodology is that it "relies upon multiple unfounded assumptions." (Def. Mem. in Supp. of Mot. to Exclude, at 14.) The Defendant raises a litany of examples to support this claim, including Mr. Thomas's decision to "exclud[e] the $3.4 million impairment charge incurred by [the Plaintiff] in 2013," and that "[the Plaintiff] would have continued operating on [the Defendant's] property until the year 2023." (*Id*. at 14-15.) To support excluding the opinions of Mr. Thomas on these grounds, the Defendant points to Fourth Circuit precedent which bars expert testimony "based on assumptions which are speculative and not supported on the record." (*Id*., quoting *Tyger*, 29 F.3d at 142.) The Plaintiff argues, by contrast, that Mr. Thomas' opinions were not based on improper assumptions, that the

8

Defendant merely disagrees with Mr. Thomas' conclusions, and that these issues, along with others raised by the Plaintiff, must be decided by a trier of fact. (*Id*. at 18-19.) The Court agrees with the Plaintiff that Mr. Thomas' expert testimony is reliable and that his methodology is permissible within the liberal standard of Rule 702 and *Daubert*.

   *C) Relevance*

The Defendant also seeks to exclude Mr. Thomas' testimony on the grounds of relevance. The Defendant's first relevancy argument is that because Mr. Thomas did not tailor his investigation, reports and testimony to the remaining claims in this case, his testimony no longer "fits" the Plaintiff's cause of action, is not a reliable measure of the Plaintiff's damages, and is therefore inadmissible. (Def. Mem. in Supp. of Mot. to Exclude, at 7-9.) Because Mr. Thomas arrived at his opinions based on an understanding of the Defendant's alleged "misconduct" which included allegations no longer before the Court on remand, the Defendant argues his opinions are not "causally related to the alleged harms" at issue in this case. (*Id*. at 8.) More specifically, by improperly incorporating the Defendant's decision to upgrade the coal wash plant into his damages calculation, the Defendant claims that Mr. Thomas rendered his damages calculations inadmissible, because that decision "formed the basis of [the Plaintiff's] claims for fraudulent concealment and negligent misrepresentation," which were previously disposed of by this Court on summary judgment. (*Id*.)

The Defendant also targets Mr. Thomas' conclusions on the Plaintiff's cash flow and financial performance. Specifically, the Defendant notes that, in reviewing whether the Plaintiff produced sufficient cash flow from the impoundment operations to service third-party debt, Mr. Thomas "noted that [the Plaintiff's] performance was adequate … to additionally fund one-half of

9

the Overburden project's 2010 and 2011 capital expenditures…" (*Id*.) The Defendant claims that this conclusion, and Mr. Thomas' calculations about the Plaintiff's future cash flow, "rest[] on the false assumption" that the Defendant was responsible for the other half of the Overburden project, and are therefore inextricably linked to the Plaintiff's now-abandoned claims for unjust enrichment. (*Id*.) According to the Defendant, they had no obligation to fund any portion of the Overburden project, and Mr. Thomas' future cash-flow calculations therefore "convert[] [the Plaintiff's] four-year loss into a four-year gain." (*Id*.)

In opposing the Defendant's motion, the Plaintiff argues that Mr. Thomas' opinions clearly fit the case, and that Mr. Thomas "has never stated or implied that his lost profits damages calculation is based on [the Plaintiff's] tort claims." (Pl's' Mem. in Opp., at 7.) To the contrary, the Plaintiff argues that Mr. Thomas based his calculations on the assumption that the Defendant's actions deprived the Plaintiff of access to the impoundment pond, and the ability to recover coal fines from the pond. (*Id*. at 8.) The Plaintiff also notes that the Defendant's damages expert applied the same assumption in calculating the Plaintiff's lost profits. (*Id*.) Thus, the Plaintiff argues that the Defendant applies an overly formalistic analysis to the evidence which "confuses the concepts of 'harm' and 'misconduct,' and improperly asserts that to be admissible, expert testimony must be linked to a specific cause of action. (*Id*.)

The Plaintiff also contests the Defendant's argument as to the Overburden project. The Plaintiff acknowledges that Mr. Thomas assessed whether it "generated 'cash flows sufficient to service all third party debt from fiscal 2008 through fiscal 2011,'" and that as a result, Mr. Thomas found that the Plaintiff's "performance was adequate during this timeframe to additionally fund one-half of the Overburden Project's 2010 and 2011 capital expenditures." (*Id*.) However, the

10

Plaintiff strongly disputes the Defendant's claim that these decisions require the Court to find that any future cash flow projection opinions from Mr. Thomas are necessarily derived from the "assumption that [the Defendant] is somehow responsible for the other half of the cost of the Overburden Project." (Id.) The Plaintiff argues to the contrary that Mr. Thomas arrived at his opinions on future cash flow, "including his related opinions on the future costs to deduct from [the Plaintiff's] future lost profits," based on the assumption that the Plaintiff, rather than the Defendant, would fund the second half of the Overburden project. (*Id*. at 10.)

After evaluating the parties' arguments, and reviewing the reports and testimony by Mr. Thomas, the Court finds that the Defendant's first argument fails, and that Mr. Thomas' reports and testimony are admissible at trial. The central issue remaining in this case is whether the Defendant breached a contractual obligation to provide the Plaintiff with access to the impoundment pond, such that the Plaintiff could profitably extract the coal fines from the pond. If the jury at trial determines that such an obligation existed, the Plaintiff may be entitled to damages for the breach of contract, and lost profits therefrom. Mr. Thomas estimated the Plaintiff's damages by focusing on this harm, rather than a particular cause of action. As the Plaintiff notes, the Fourth Circuit has held that an expert's damages opinions must be "causally related to the alleged harm." *Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994). The Court is satisfied that Mr. Thomas' calculations and opinions satisfy this requirement, are relevant, and are, therefore, properly admissible at trial. To the extent that the Defendant wishes to object to specific testimony on relevancy grounds, the Defendant retains the right to do so at trial.

The Court also rejects the Defendant's contention that Mr. Thomas improperly calculated the Plaintiff's projected future cash flow by attributing responsibility for one-half of the Overburden project to the Defendant. This claim is a red herring which seeks to distract the Court from the broader question of whether Mr. Thomas has sufficient expertise, and employed acceptable methods. Moreover, as the Plaintiff notes, when analyzing the Plaintiff's future cash flow, Mr. Thomas expressly included the "costs to complete the Overburden Project" in the Plaintiff's projected capital expenditures from 2012. (*See* Exhibit 5 to 2013 Thomas Report, att'd as Exh. C to Def. Mot. to Exclude.) To the extent that Mr. Thomas may have otherwise failed to account for the costs of the Overburden project in projecting the Plaintiff's future cash flow, these matters may be addressed at trial by the Defendant through cross-examination and the presentation of witnesses.

The Defendant's second relevancy objection focuses on Mr. Thomas' opinions on profits earned by the Defendant under the CPRRA. The Defendant claims that these opinions are insufficiently "tied" to the Plaintiff's claims for damages in this case. (Def. Mem. in Supp. of Mot. to Exclude, at 10.) Because the Plaintiff does not seek disgorgement of these profits, the Defendant argues that such opinions are irrelevant to this case. The Plaintiff argues, by contrast, that these opinions are relevant to many issues in the case. (Pl's Mem. in Opp. to Def. Mot. to Exclude, at 11.) These issues include whether the parties would have extended the life of the CPRRA beyond the 2013 termination date, and whether the Plaintiff's business plan and operation were "failures from the start." (*Id*. at 11-12.) The Court agrees with the Plaintiff that these issues, which specifically relate to the Plaintiff's potential damages under the CPRRA, are likely to emerge at trial, and that Mr. Thomas' opinions on the Defendant's profits are relevant to these

issues. Thus, the Plaintiff has established by a preponderance of the evidence that Mr. Thomas' testimony as to the profits earned by the Defendant under the CPRRA is relevant, and should not be excluded on a *Daubert* motion.

## CONCLUSION

Wherefore, after careful consideration, the Court **ORDERS** that the *Defendant Pinnacle Mining Company, LLC's Daubert Motion to Exclude the Report and Testimony of Vincent Thomas* (Document 241) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: February 4, 2016

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA